# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 7, 2012

## STATE OF TENNESSEE v. HAROLD MOORE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-02071    Paula Skahan, Judge**

**No. W2011-02333-CCA-R3-CD  - Filed December 26, 2012**

A Shelby County Criminal Court Jury convicted the appellant, Harold Moore, of selling less than .5 grams of cocaine, possessing less than .5 grams of cocaine with intent to sell, and possessing less than .5 grams of cocaine with intent to deliver.  After a sentencing hearing, the trial court merged the convictions and sentenced him to five years in confinement.  On appeal, the appellant contends that the evidence is insufficient to support the convictions. Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**.

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, and ROGER A. PAGE, JJ., joined.

Tony N. Brayton (on appeal) and Alicia Kutch (at trial), Memphis, Tennessee, for the appellant, Harold Moore.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Doug Carriker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, Officer Shawn May of the Memphis Police Department (MPD) testified that in August 2009, he was working in the Undercover Investigations Unit as a "deep cover operative."  About 1:00 p.m. on August 4, 2009, Officer May was putting gasoline into his truck at the BP station at the intersection of Shelby Drive and Tulane Road.  He said he made eye contact with a man and asked if the man was "good," which was Officer May's way of

asking if the man had any drugs. Officer May gave the man twenty dollars, and the man gave him a substance that looked like crack cocaine. Officer May video-recorded the transaction, and the State played the video for the jury.

Officer May testified that the man said his name was "Red" and that the man gave him a telephone number. Officer May recorded the number in his cellular telephone, returned to his truck, and put the substance into a bag. Officer May later gave the substance to Officer Anthony Goodwin. Officer Goodwin tested the substance in Officer May's presence, and the substance tested positive for cocaine. Officer May said that he put the telephone number the man had given him into a database and that the number "came back to" the appellant. From the telephone number, Officer May learned the appellant's name, date of birth, and social security number. Two to five hours after the drug transaction, Officer May looked up the appellant's photograph in another database. He said that "as soon as I saw the image, it was in fact the same person who I had just gotten the crack cocaine from that day." He explained that

> throughout time [a] person's characteristics will change a little bit but one in particular looked very close to exact age and exactly how I had just viewed the person. It was enough to where at the exact time I saw the picture I knew it was in fact the same person.

Officer May identified the appellant at trial as the man who sold him cocaine on August 4, 2009. He said the appellant did not look the same as he did in the database photograph in that the appellant at trial was "[c]lean cut, shaved, he's got glasses on, tie, looks like his complexion is a little different." When asked what characteristics he recognized about the appellant, Officer May said,

> First and foremost the eyes, eyes always tell it for me, but throughout time and having training I look at hairlines. You don't look at things that can change, beards, even tattoos. You look at hairlines and eyes, ears how they're set, lips, mouth. You don't pay attention to clothing and how people present themselves.

Officer May testified that he gave the appellant's information to the MPD's identification team and that the team put together a photograph array containing the appellant's photograph. On September 29, 2009, Officer May viewed the array and identified the appellant. He said he was certain the appellant was the man who sold him cocaine on August 4, 2009.

On cross-examination, Officer May testified that the appellant was an "average size" and that he thought the appellant was wearing a tank top and shorts on August 4. He said he also thought the appellant had "a little bit" of facial hair at the time of the transaction. Officer May worked as an undercover operative for fourteen months and conducted 800 to 900 drug transactions during that time. He said he remembered this particular transaction because

> I was the one that identified him and -- doing research. He gave an address on a report that was less than a mile from where we did you know the drug transaction. So me being able to ID him that put me more involved and that helped me recall certain parts of it better.

Officer May conducted other drug transactions on August 4, 2009, but his transaction with the appellant was the first one of the day.

Officer Anthony Goodwin testified that in August 2009, he was an evidence custodian for the MPD's Undercover Operations Unit and was responsible for processing and tagging evidence bought by "undercovers." On August 4, 2009, Officer Goodwin processed and tagged evidence collected by Officer May. He tested the substance Officer May bought at the BP station, and the substance tested positive for cocaine. The cocaine weighed 0.2 grams.

Detective Chartell Butler of the MPD testified that he was responsible for processing paperwork for drug seizures. In December 2010, he received a request from the district attorney's office to transport the cocaine in this case to the Tennessee Bureau of Investigation (TBI). Detective Butler transported the evidence as requested.

Officer Jonathon Clapp of the MPD testified that on September 21, 2009, he created a six-photograph array that included the appellant's photograph. On September 29, 2009, he showed the array to Officer May. On cross-examination, Officer Clapp testified that officers sometimes misidentified defendants. However, he said that misidentifications occurred "[v]ery rarely."

Melanie Johnson, a special agent forensic scientist with the TBI, testified that she tested the substance delivered by Detective Bulter. The substance was cocaine and weighed 0.1 grams. At the conclusion of her testimony, the State rested its case.

Lekeshia Douglas testified for the appellant that in March 2009, she met the appellant in a hospital where Douglas's husband was dying of cancer and the appellant's mother was ill. At that time, the appellant had a mustache and a large tattoo of praying hands on his left

arm. After the appellant's mother died, he got another large tattoo on his right arm. The new tattoo was a picture of his mother. Douglas said that the appellant was not involved in drugs and that she had never known him to sell drugs. On cross-examination, Douglas testified that she was not with the appellant on August 4, 2009.

The then thirty-seven-year-old appellant testified that he did not sell drugs to Officer May. He said that he lived with both of his parents while he was growing up, that his father was an architectural engineer for the United States Corps of Engineers, and that his mother was a school teacher. In 2009, the appellant was unemployed but received $694 per month in social security disability payments due to a herniated disk in his back. He also was a full-time student at Southwest Tennessee Community College and received money from student loans. On April 28, 2009, the appellant's mother died and left him and his sister about $50,000. The appellant also received the home in which he grew up and moved into the home. The house still had a mortgage, but the appellant made the payments. He said that the home was about one mile from the BP station and that he went to the BP station once or twice. He said that he only went to the BP station at night.

The appellant testified that in August 2009, he was studying to be a physical education teacher and was going to class on a regular basis. He said that he got out of class at 12:15 p.m., that it took him thirty-five to forty-five minutes to drive home, and that he never wore tank tops to school. The appellant had plenty of money at that time and grown children in college. He said that he was not the man in the video selling drugs to Officer May and that the man in the video was darker and larger than he. He said that no tattoos could be seen on the man's arms and that the man's nose was larger than his nose. The appellant removed his shirt and tie and showed his tattoos to the jury. He said that the telephone number reportedly given to Officer May was the number for his ex-wife's telephone and that he had never used her telephone. He stated that the money his mother left to him "ran out" in April 2010 and that he could no longer make his mortgage payments. He said he pled guilty to unauthorized use of a motor vehicle in 2002 and passing a worthless check in 2005.

On cross-examination, the appellant acknowledged that he was wearing a white tank top under his shirt and tie and that the tank top was similar to the tank top worn by the man in the video.

The jury convicted the appellant as charged of selling less than .5 grams of cocaine, possessing less than .5 grams of cocaine with intent to sell, and possessing less than .5 grams of cocaine with intent to deliver, Class C felonies. After a sentencing hearing, the trial court merged the latter two convictions into the conviction for selling less than .5 grams of cocaine and sentenced the appellant to five years in confinement.

-4-

## II.  Analysis

The appellant contends that the evidence is insufficient to support the convictions because the State failed to prove that he was the man who sold cocaine to Officer May on August 4, 2009.  In support of his claim, the appellant notes that Officer May never called the telephone number "Red" gave to him, did not recall any large tattoos on Red's arms, identified the appellant from a 2005 database photograph, and participated in hundreds of drug transactions.  The State argues that the evidence is sufficient.  We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact.  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury.  Id.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Taken in the light most favorable to the State, the evidence shows that Officer May made eye contact with a man at the BP station, asked if the man was "good," and bought $20 worth of crack cocaine from him.  The man, who identified himself as "Red," gave Officer May a telephone number, which Officer May tracked to the appellant.  Once Officer May learned the appellant's name, he was able to view a photograph of the appellant and recognized the appellant immediately as Red.  Although Officer May did not recall any large tattoos on the appellant's arms, he said that he recognized the appellant from other characteristics such as his eyes and hairline.  The State played the video-recorded transaction for the jury, and the defense cross-examined Officer May regarding his identification of the appellant.  The jury was able to view the appellant at trial and obviously concluded that he was the man in the video.  The jury, not this court, was in the best position to judge the credibility of the witnesses, and the jury obviously accredited Officer May's testimony.  The evidence is sufficient to support the convictions.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE